FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

NOV 14 2022

MITCHELL R. ELFERS
CLERK

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA )
)
Plaintiff, ) 18-CR-02945-WJ
)
vs. )

)
SIRAJ WAHHAJ, )
)
Defendant, )

**DEFENDANT'S SUPPLEMENT MOTION**

COME NOW, Supplement motion, Defendant submit the following:
I added this supplement because defendant recently received these documents after his motion was completed. On August 29, 2018 at 4:49 PM Judge Jeff Foster McElroy of the 8th judicial District Court dismissed without prejudice the pending claims No. D-820-CR- 2018-00167 and N0. D-820- CR-2018-00170. Judge Jeff Foster McElroy order of dismissal without prejudice states. "

1. The court has jurisdiction over the parties and subject matter.

2. On August 8, 2018, these defendants had a first appearance before the distinct court.

3. On August 14, 2018, the district court denied the state's motion for preventive detention.

4. The district court set conditions of release that had to be met prior to the release of defendants.

5. Jany Levelille could not exercise her conditions of release because she was in federal custody on an immigration warrant. She was in custody on this matter from August 8 through the date of this order.

6. Siraj Ibn Wahhaj could not exercise his conditions of release because he was in

detention from a fugitive warrant from Georgia from August 14, 2018 through August 23, 2018. For other reasons, he did not exercise this conditions of release once the state dismissed the fugitive warrant charge. He was in custody on this matter from August 8 through the date of this order.

7. Rule 5-302 (A) (3) NMRA, " **Time limits**. A preliminary examination shall be scheduled and held within a reasonable time but in any event **no later than ten (10) days if the defendant is in custody,** and no later than sixty(60) days if the defendant is not in custody, of .... **the first appearance;**"( emphasis added)

8. The ten days excludes weekends and holidays.

9. Therefore, the time for conducting a preliminary would have been August 22, 2018 or fourteen days after the first appearance.

10. The District Attorney failed to request for a preliminary hearing. No preliminary hearing was held while these defendants have been in custody in violations of Rule 5-302(A)(1).

11. As of August 29, 2018, the defendants have been in custody for twenty -one days from first appearance.

12. Rule 5-302(a)(2) NMRA provides for extensions of time for a preliminary hearing. The state failed to request an extension.

13. The court is without authority to retroactively grant an extension following the expiration of the deadline. Regardless, there were no exceptional circumstances that justified the delay in conducting a preliminary hearing.

14. The District Attorney was not diligent in the prosecution of this case and adhering to the rules of criminal procedure.

15. Rule 5-302 (A) (3) NMRA gives the court no discretion as to the remedy for violation of the rule.

16. Rule 5-302 (A) (3) NMRA gives the court no discretion as to the remedy for violation of the rule. Rule 5-302(A)(3) NMRA reads, **" [i]f preliminary examination is not held within the time limits in this rule, the court shall dismiss the case without prejudice and discharged the defendant."**

IT IS THEREFORE ORDERED that all pending claims are dismissed without prejudice for failing to comply with the time limits and the defendants are discharged". ( See Attachment 14 Order of dismissal)

On August 23, 2018 the Deputy District Attorney Timothy R. Hasson dismissed the felony complaint N0. M-53- ER-201800018, Magistrate judge Jeff Shannon sign the order. (See Attachment 15 Notice of Dismissal of Felony Criminal Complaint and Judge's order) On August 21, 2018 Clayton County DA releases the hold on Mr. Wahhaj. (See Attachment 16 Clayton County release) TCSO kept defendant's incarcerated in TCD for two additional days in order to give the FBI time to file a criminal complaint on August 31, 2018. ( See Doc.1 SA Garcia Criminal Complaint ) On August 31, 2018 Nolle Prosequi N0. D-820-CR-201800182. ( See Attachment 17 Nolle Prosequi) On August 29, 2018 Judge McElroy ruling states it is therefore ordered that all pending claims are dismissed without prejudice for failing to comply with the time limits and the defendants are discharged.

Yet at the behest of the FBI Deputy District Attorney Timothy R. Hasson kept defendants incarcerated to allow time for the FBI to prepare affidavits for the criminal complaint. TCSO and Deputy District Attorney Timothy R. Hasson defied Judges McElroy legal order to discharged defendants. TCSO and Deputy District Attorney Timothy R. Hasson illegally kept defendants in custody in violation of their 14th Antecedent Constitutional rights. On August 31, 2018 the FBI illegally seized defendants from TCSO custody without filing a habeas corpus ad prosequendum. In an attempt to cover up the illegal removal of defendants from TCD, Deputy District Attorney Timothy R. Hasson Nolle Prosequi the charge 5-820-CR-2018-00182 on August 31, 2018. The judge would have not discharged defendants if there was pending charges. Judge McElroy already dismissed all pending claims and discharged defendants due to the Deputy District Attorney Timothy R. Hasson failure to hold a preliminary hearing in ten days on August 29, 2018. Deputy District Attorney Timothy R. Hasson did not inform defendants on August 29, 2018 that the pending claims were dismissed. Judge McElroy was following Rule 5-302 (A) (3) NMRA gives the court no discretion as to the remedy for violation of the rule. Rule 5-302(A)(3) NMRA reads, **" [i]f preliminary examination is not held within the time limits in this rule, the court shall dismiss the case without prejudice and discharged the defendant."** On reviewing these documents defendant observed how many different magistrate and district judges TCSO involved in this case. It is like TCSO were shopping for judges to further their investigation. TCSO involved magistrate Judges Ernest L. Ortega, Jeff Shannon and district Judges Sarah Backus, Jeff Foster McElroy and Emilio Chavez.

On August 7, 2018 Anthony Barajas CYFD investigator filed a Affidavit for exparte custody order recommending CYFD to take custody of defendant's children. On page 6 paragraph 1 of that affidavit he stated " on August 3, 2018, law enforcement conducted forensic safe room interviews of the six eldest children. Ms. Duran and I were in attendance and observed all the interviews." (See attachment 18 Affidavit For Exparte

Custody Order) He did not state whose the law enforcement that conducted those interviews. This is critical because the record reflects that SA Travis Taylor first interrogated/interviewed defendant's children on August 7, 2018. Defendants did not received audio or video recordings of the August 3, 2018 safe room interviews/interrogations.

That was a violation of N,M. St. Ann [ 29-1-16 (2006) requires law enforcement officers, with limited exceptions, to electronically video and audio record their custodial interrogations of minors.

Mr. Barajas is an investigator for CYFD. He had a duty to investigate /interview the children to substantiate TCSO allegation before removing the children from their parents. What is more troubling is he and Ms. Duran stood by and watch other law enforcement FBI and TCSO interrogate/ interview defendant's six eldest children. Lets be clear the six eldest children Mr. Barajas referred to are a 15 -year- old, a 13 -year- old and four 8 -year -old's.

On August 3, 2018 Mr. Barajas and Ms. Duran stood by and watch the FBI and TCSO interrogate/ interview defendant's minor children without the custodial interrogation recorded in violation of N,M. St. Ann [ 29-1-16 (2006) Mr. Barajas and Ms. Duran failure to act makes them complicit to the conspiracy to violate defendant's constitutional rights. Mr. Barajas and Ms. Duran should have known that when law enforcement interrogated/ interviewed defendant's minor children the custodial interrogation/ interview should have been audio and video recorded per N,M. St. Ann [ 29-1-16 (2006)

The fact remains it was not beneficial to have the first encounter between CYFD, TCSO and FBI and defendant's minor children a 15 -year- old, a 13 -year- old and four 8 -year -old's recorded. The FBI, TCSO and CYFD had to make sure defendant's minor children a 15 -year- old, a 13 -year- old and four 8 -year -old's statements were consistent before being recorded on the official record. For Mr. Barajas to write a report substantiating abuse without first properly investigating TCSO claims unimpeded and swearing to the report makes him in direct derelict of duty and a co conspirator to violate defendant's constitutional rights. Mr. Barajas, Ms. Duran, CYFD, TCSO and the FBI were suppose to be operating interdependently to up hold the constitutions.

It is clear that TCSO and CYFD were marching at the orders of the FBI. The FBI was obsessed with their misguided attempt at manufacturing terrorism charges since 2003 that they enlisted TCSO, CYFD to fulfill their ambitions.

Defendant is requesting for Mr. Anthony Barajas and Ms. Sherrie Duran deposed. Defendant wants them to swear under oath what law enforcement were present on August 3, 2018, and who actually interrogated/ interviewed defendant's 15 -year- old, 13

-year- old and four 8 -year -old's. If those interrogations/ interviews were recorded? If not why not? If they were, where are those recordings?

Mr. Barajas further stated on page 6 paragraph 2 "on August 5, 2018, on call investigator Rachel Rivera conducted 48- home visits in each foster home with children. The purpose of the home visits was to speak to the children and how they are adjusting, I assisted Ms. Rivera on the final home visit."He did not state when the final home visit was conducted. Where are those reports of the first visits by investigator Rachel Rivera. Defendant is also requesting for Rachel Rivera deposed. She would have first hand information on defendant's children initial disposition. If the children were asking for their parents, afraid, acting out, and crying because of the illegal separation perpetrated by TCSO, CYFD and the FBI.

I am requesting for the emergency statewide central intake received by CYFD field office concerning the family on August 3, 2018. On page 3 of Mr. Barajas sworn affidavit report he stated " in subsequent interviews with some of the children, they stated Farrolll and Jamil assisted their fathers in digging the tunnel."(See attachment 18 Affidavit For Exparte Custody Order page 3) What children and when was these subsequent interviews taken place. Mr. Barajas Ms. Duran, TCSO and the FBI were interrogating /interviewing defendant's15 -year- old, 13 -year- old and four 8 -year -old's on unknown dates without audio and video recorded. On page 4 of that report he stated " the adults are incarcerated and the family is now in the process of being evicted from the property where the compound was located." Defendant's were illegally evicted before properly being evicted.

The legislative history of the Delinquency Act, N.M. Stat. Ann. § 32A-2-14(F) (2009), and the importance of protecting children younger than fifteen years of age from unknowing or involuntary waivers of their rights leads to the conclusion that clear and convincing evidence is the proper burden of proof for rebutting the presumption of inadmissibility under § 32A-2-14(F).

The State must first prove by clear and convincing evidence that at the time the thirteen-or fourteen-year-old child made his or her statement to a person in a position of authority, the child had the maturity to understand his or her constitutional and statutory rights and the force of will to assert those rights. It is not necessary to prove that the child had the maturity and intellectual capacity of an average fifteen-year-old child.

Absent an evaluation by an expert, interrogators in a position of authority can preserve the evidence needed by the State to rebut the presumption of inadmissibility for

thirteen-and fourteen-year-old children under the Delinquency Act, N.M. Stat. Ann. ᴄ 32A-2-14(F) (2009).

N.M. Stat. Ann. ᴄ 29-1-16 (2006) requires law enforcement officers, with limited exceptions, to electronically video and audio record their custodial interrogations.

In order to obtain the clear and convincing evidence needed to rebut the presumption of inadmissibility, the interrogator who is in a position of authority must first adequately advise the thirteen-or fourteen-year-old child of his or her Miranda and statutory rights and then invite the child to explain, on the record, his or her actual comprehension and appreciation of each Miranda warning.

With their inadequate responses, Mr. Barajas and Ms. Duran violated defendant's constitutional rights. Although neutral investigators should initially respond by promptly investigating the complaint, Mr. Barajas and Ms. Duran failed to take this first step. Their presence when TCSO and the FBI were illegally interrogating / interviewing defendants 15 -year- old, 13 -year- old and four 8 -year -old's without their parents knowledge, nor consent, nor Miranda rights read, nor counsel present, nor court order, and without the custodial interrogation/ interviews audio or video recorded, proved insufficient to stop the defendant's constitutional rights form being violated, they failed to take any steps. Although they could have objected, filed a complaint, or left in protest to the egregious constitutional violations they were witnessing, they failed to exercise any of these options. One thing Mr. Barajas did was to file in his sworn affidavit that he was a witness to theses constitutional violations perpetrated by TCSO, FBI and CYFD. Mr. Barajas and Ms. Duran thus failed to meet their statutory obligations. These are not good faith errors that the court can turn a blind eye to. Any discrepancies in the conduct of TCSO, FBI and CYFD are intentionally.

In summary, the defendant believes with proofs that their conduct was unlawful and they are co conspirators to violate defendant's constitutional rights. Their conduct were unreasonable, defendant substantiates the facts supporting those beliefs.

## CONCLUSION

Wherefore, for the foregoing reasons, the defendants respectfully urge this Court to

dismiss the indictment with prejudice.

Siraj Wahhaj
00414151

I swear under penalty of perjury that these statements are true and correct.

Dated: 11/8/22

SIGNED AND SWORN TO before me this 8th day of November 2022, by Wahhaj Siraj

My commission expires; May 9, 2026
(SEAL)

Notary public

STATE OF NEW MEXICO
NOTARY PUBLIC
PATRICIA LOPEZ
Commission # 1137934
My Comm. Exp. May 9, 2026

# DECLARATION OF SIRAJ WAHHAJ

I, Siraj Wahhaj (DOB) 6/21/78). do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct.

1. I am currently detained at Cibola County Correctional center ("CCCC"), in Milan New Mexico, I have been detained at CCCC since September 2018.

2. I was indicted on federal criminal charges in September 2018.

3. Defendants 1st , 2nd ,4th ,5th ,6th and 14th Amendments of the Constitution and Religious Freedom Restoration Act (" RFRA") were violated by law enforcement officials.

4. When you analyze Wahhaj's and his co defendant's case objectively it is clear to see that law enforcement's plots against defendants did not originate in August 2018, it started many years earlier.

5. Title: Redacted (RED) Request for CT lab Assistance Date:08/17/2018 regarding RED
From: COUNTERTERRIOSM DG- OPSI_ITOSI_ CONS Contact: FIRMANI CHRISTIAN Approved by : RED Drafted by: FIRMANI CHRISTIAN Case ID# RED SIRAJ IBN WAHHAJ TIER 6 -All Others; HVE HOMEGROWN VIOLENT EXTREMIST RED DIGITAL MEDIA ASSISTANCE RED
Contact Information Case Agent or POC:SA Travis Taylor 505- 438-5505 *RED *CART Examiner Name : Travis Taylor, RED

Case Background RED FBI NY opened a full investigation into Wahhaj in 2003 based on information indicating he was involved in training activities related to sutra teams ( closed on 2009). FBI AT opened preliminary investigation into Wahhaj in July 2015 based on information indicating Wahhaj was engaging in firearms training. ( BN# 3150)

6. The FBI stated Wahhaj was involved in training activities related to sutra teams. The key words is training activities not terrorism or violent extremism.

7. Sutra teams is an interesting word that needs to be explored more in – depth.

8. In Islam sutra means a ( barrier) placed in front of someone making prayer. No one is suppose to walk in front of you while praying, so the Muslim places a barrier in front of them while they pray.

9. After September 11, 2001 terrorist attacks anti Islam attacks on Muslims and our religious institutions have risen 100%.

10. In response to that security crisis Muslims deployed sutra teams to defend the Muslims and our religious institutions.

11. In essence sutra teams are security teams placing themselves as barriers in front of Muslims and our religious institutions, protecting them against anyone who wishes to cause them harm.

12. The FBI used that word sutra as if was something nefarious.

13. Every major faith group has a security apparatus in place to defend their religious institutions.

14. The Christians, Jews all have security measures in place to protect their congregation and religious institutions.

15. They engage in ongoing training to meet the ever increasing threat of the world we live in.

16. Those religious groups have a right to protect themselves and so do we Muslims have a constitutional right to protect ourselves.

17. To single out Muslims for protecting our congregation and religious institutions is the heart of the discrimination.

18. Defendant have many security credentials attained throughout the years from reputable schools. ( See Exhibit security credentials)

19. He acquired security licenses in multiple states. He also acquired his arm-guard, private investigator's license, conceal carriers permit accepted in 28 states. He successfully completed executive protection courses, Community Emergency Response Team (" CERT") training, CPR, contractor's course, NRA gun safety, firearms training everything perfectly legal and constitutional.

20. The FBI had long known defendant is in the security profession. They indicated that in their reports.

21. The FBI approved over the course of many years defendant's purchases of every firearm from GUNS & AMMO. They approved every background check. ( See ATF reports )

22. It defies logic defendant was under full investigation from 2003 closed in 2009 and opened back in 2015, that the FBI would approve the purchases of all those firearms.

23. They have known defendant attended numerous security training throughout the years.

24. Yet all those security activities did not result in terrorism charges why?

25. The question remains are Muslims afforded the protection and rights of the constitution or not?

26. Because defendant is a Muslim do he have a right to practice the Second Amendment of the Constitution and bare arms or not?

27. Defendant continuously upgraded his security education throughout the years because he wanted to go after the **BIG** multi-million dollar security contracts.

28. Does being a Muslim prohibits defendant from being in the security business? Is he not allowed to compete for **BIG** lucrative security contracts?

29. The FBI, Taos County Sheriff Office ("TCSO"') and Children Youth and Family Department ("CYFD") all stymied that.

30. They maligned defendant's character unjustifiable all over the media.

31. Defendant sacrificed a great amount of time, resources, and energy, he had to endure tremendous obstacles in order to obtain his security credentials.

32. Defendant was able to provide for his family through his security profession.

33. Now all of that is destroyed because of the outrages conduct perpetrated by the FBI, TCSO and CYFD.

34. If it was not because defendants are black and Muslims it is highly unlikely that defendants would be incarcerated.

35. FBI opened a full investigation into Wahhaj in 2003 and closed in 2009. (BN#3150)

36. It does not state who authorized the investigation. What was learned from the investigation? Why was the investigation closed?

37. The investigation had to be approved at the highest of levels.

38. Why was the persons or person who approved the report name redacted? Why was the other agency/ name who sought the search warrants redacted?( BN# 3150)

39. Yet defendants were classified as Tier 6 Home Grown Violent Extremist ( "HVE")

40. This classification was made in 2003 based on what?

41. After September 11, 2001 attacks there has been an alarming number of constitutional violations perpetrated by law enforcement agencies against Muslims nationwide.

42. The number of hate crimes perpetrated against Muslims increased 100%.

43. Defendant understands the need to be proactive in pursuing terrorist, however to target the religion of Islam is unwarranted, discrimination, very dangerous and unconstitutional.

44. The FBI exclusively targeted Muslims in their houses of worship.

45. After 2001 the FBI had launched illegal, unjust covert investigations into Muslims nation wide.

46. The war on terror is an euphemism for war on Islam.

47. The Woods Procedures implemented in 2001 is directly reflected because of those constitutional violations. **FBI Woods Procedures, " Woods Files," and Certain Oversight mechanism.** The FBI implemented its Woods procedures in 2001 following errors in numerous FISA applications submitted to the FISC in FBI counterterrorism investigation. The stated purposes of the Woods Procedures are to minimized factual inaccuraciesnin FISA applications and to ensure that statements contained in applications are " scrupulously accurate." FBI policy requires the case agent who will be requesting the FISA applications to create and maintain an accuracy sub- file ( known as a Woods File") that contains; (1) supporting documentation for every factual assertion contained in a FISA application, and 2) supporting documentation and the results of required database searches and the other verification. Following the creation of the Woods File, the case agent signs the " FD- 1079 FISA Verification Form" " ( Woods Form) to affirm the accuracy of each and every assertion....... and that back- up documentation for each such fact has been retained" in the Woods File. The supervisory special agent is also required to sign the form, confirming that the supervisory special agent has reviews the Woods File and determined that it contains supporting documentation for every factual assertion within the FISC applications. This form must be completed prior to an application being submitted to the FISC. FBI policy also states that the FBI and DOJ's NSD " have instituted two broad oversight mechanism designed to ensure that FISA applications contain accurate and verified information." Specifically, the FBI requires its Chief Division Counsel (CDC) in each FBI field office to perform each year an accuracy review of at least one FISA applications from that field office. Similarly, NSD's Office of Intelligence (OI) conducts its own accuracy review each year of at least 1 FISA application originating from each of the approximately 25 to 30 different FBI field offices, Both the FBI's and NSD's accuracy reviews are performed on applications that have already been submitted to and approved by the FISC. The agreed- upon procedures for these accuracy reviews are memorialized in a 2009 joint FBI- NSD memorandum.

In 42 FISA applications only 3 to 42 did not identify any deficiencies, the reports covering the remaining 3 applications identified a total of about 390 issues including unverified, inaccurate, or inadequately supported facts, as well as typographical errors. That is, the accuracy reviews were not being used by the FBI as a tool to help assess the FBI's compliance with its Woods Procedures, we have identified 4 applications for which, as to date of this memorandum, the FBI either has been unable to locate the Woods File that was prepared at the time of the applications or for which FBI personnel suggested a Woods File was not complete. ( See Woods File)

48. The FBI had been conducting illegal surveillance on defendant since 2003 and

closed in 2009.

49. In order for the FBI to conduct surveillance on defendant they would have had to submit a FISA application.

50. If continued FISA coverage on a U.S, person deemed necessary, the FBI must request from the FISC a renewal of its authorization every 90 days.

51. According to FBI policy, the case agent is required to re- verify the statements of fact repeated in a renewal application from the initial FISA application remain true and must obtain supporting documentation for new statements of fact included in the renewal application that goes to FISC for approval.

52. The FBI opened up the full investigation into Wahhaj in 2003 and closed in 2009. The FBI would have had to renew the FISA applications 4 times a year and 24 times in the course of 6 years. Where are those FISA applications?

53. It is defendant's right to have access to the applications which the FBI was suppose to file, verify the accuracy of the information in order to conduct surveillance on a U.S. person.

54. If that was not done then that was a violation of defendant's constitutional rights.

55. FBI AT opened a preliminary investigation into Wahhaj in July 2015 based on information indicating Wahhaj was engaging in firearms training.

56. In 2015 defendant enrolled in multiple firearms courses from a reputable school Atlanta Firearms. ("AF")

57. Defendant enjoyed those course so he signed up for more.

58. Defendant found a school that taught multiple different firearms courses.

59. Defendant saved up his hard earned legal money to invest in his security profession.

60. It was a good opportunity to add to defendant's resume.

61. Defendant successfully completed those courses.

62. According to AF enrolling in so many classes in succession raised a red flag

so they contacted FBI AT.

63. Defendant doubts that had he been white and christian AF would have never contacted the FBI.

64. Nevertheless what was the outcome of that intrusive investigation? It does not state that the investigation was ever closed.

65. There was no arrest or indictment as a result of defendant taking those courses.

66. Again which goes back to the heart of the issue. Is because defendant is a Muslim he is not allowed to enroll in firearms classes?

67. Is firearms training exclusively for whites?

68. Defendant rejects the notion that certain training and profession is reserved only for some citizens and not for others. Either the constitution is for everyone or it is not.

69. To profile the religion of Islam, discriminate against defendant all because he is a Muslim was egregious enough.

70. The FBI did not just conduct an illegal surveillance on defendant domestically they also hindered Wahhaj's travels abroad from 2005 on.

71. The FBI placed defendant on a watch list despite the fact that he did not pose, have never posed, and have never been accused of posing a threat to aviation safety.

72. In an effort to ensure aircraft security, Congress directed the transportation Security Administration ("TSA") to establish procedures for notifying appropriate official of the identity of individuals " known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety." 49 U.S. U.S.C. 114 (b)(2) TSA was further instructed to " utilize all appropriate records in the consolidated and integrated terrorist watch list maintained by Federal Government" to perform a passenger prescreening function.

73. The " No Fly list" is one such terrorist watch list and is part of a broader database developed and maintained by the Terrorist Screening Center ("TSC"). Which is administrated by the FBI. The TSC shares names of individuals who

are known or reasonably suspected of being involved in terrorist activity. The TSC shares the names of individuals on the " No fly list" with federal and state law enforcement agencies, the TSA, airline representatives, and cooperating foreign governments.

74. Federal law enforcement and intelligence agencies may" nominate" an individual for inclusion in the TSC's database, including the " No fly list," if there is " reasonable suspicion" that the person is a " known or suspected terrorist". In order for a nominated individual to be added to the " No fly list," there must be additional " derogatory information' showing that the individual " poses a threat of committing a terrorist act with respect to an aircraft. Any person placed on the "No fly list" is barred from boarding a plane that starts in, ends in, or flies over the Unites States.

75. The Department of homeland Security ("DHS") has a traveler Redress Inquiry Program (" TRIP") an administrative mechanism for filing a complaint about placement on the " No fly list". Filing a subpoena of TSC's, ICE records in conjunction with a TRIP complaint will confirm that the FBI placed the defendant on the watch list.

76. The statutory scheme embodied in the Aviation and Transportation Security Act, enacted after the terrorist attacks of September 11, 2001, In brief, the "no-fly list" is a part of this scheme -- it is a list of individuals that have been deemed by the federal government "to pose, or [as] suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety." 49 U.S.C. 114(h)(2). This list is accessible to "the Administrator of the Federal Aviation Administration, appropriate State and local law enforcement officials, and airport or airline security officers." Ibid. Section 114(h)(3)(B) instructs, "if such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual." The "no-fly list" refers to both the "no-fly" list, which allegedly contains names of people that airlines are prohibited from transporting, and the "selectee" list, which allegedly contains names of people who are subject to additional screening prior to boarding a plane.

77. Where is the derogatory information showing defendant poses a threat of committing a terrorist act with respect to an aircraft?

78. If that was not done then placing defendant on a watch list, selecting him for additional screening, hindering his travels abroad, disrupting his security business, is a violation of defendant's constitutional rights and he is asserting those rights.

79. In 2003 the FBI opened a full investigation on Wahhaj in 2005 the effects of that investigation was felt on Wahhaj's travels abroad.

80. The case was closed in 2009 yet defendant was still being detained after traveling abroad. From 2009 until current defendant is still being harassed every time he travels abroad.

81. The FBI had Immigration Custom Enforcement (ICE) border agents detain Wahhaj every time he entered the county and in some instances when he left the country.

82. At behest of the FBI. ICE agents would photo copy defendant's documents, download the contents of his phone, and interrogate him for hours each time he traveled abroad.

83. ICE is allowed to randomly screen passengers when enter the U.S.

84. Defendant does not have an issue with that, however those screens were far from random they were targeted.

85. DHS could not say perpetual detaining of Wahhaj was random or misidentification because the FBI admitted that they opened a full investigation onto Wahhaj in 2003 closed in 2009 and reopened in 2015.

86. On numerous occasion before landing the flight attendants would make an announcement to have passenger's passports out for inspection prior to leaving the plane.

87. At the exist door of the plane two Ice agents would inspect passports until defendant reaches them then they would reply " We got him".

88. They would discontinue their search and would escort defendant straight to the backroom where the secondary detention is held.

89. This happens every time defendant travels abroad.

90. Every time defendant travels abroad when he is screened by that countries ICE agents the computer says to call first.

91. While in Canada on an executive protection detail for defendant's high profile client defendant was detained, questioned, and released, that is when he

learned that the government put a hold on him.

92. This hampers defendant's security business because his client has to wait for him to clear customs.

93. This puts defendant's high profile clients in a perilous position sitting there exposed waiting for him.

94. After these experiences defendant's clients would not want to retain his services any longer, because it gives the impression defendant is not reliable and is being monitored by the government.

95. While Canada's ICE agents was conducting their investigation on defendant he was engaged in a conversation with them and they revealed to him that Canada does not have an issue with defendant it is the U.S. that placed a hold on him.

96. In essence every time a country enters Wahhaj's name passport information in their computer there is going to be a red flag.

97. This causes Wahhaj irreparable harm while traveling abroad. If Wahhaj never traveled to a country before as he enters that country the computer tags him.

98. This causes that country to look at defendant with suspicion and can cause them to conduct unnecessary surveillance on him or worst.

99. This is done intentionally, recklessly to let Wahhaj know the U.S. has a long reach. It is the heart of the oppression.

100. The FBI have no boundaries that they will not cross, even when Wahhaj returned home from making the once in a lifetime mandatory for all Muslims Hajj pilgrimage he was detained in Abu Dubai, documents photo copied, phone downloaded and interrogated.

101. The ICE agents applies a tactic that if Wahhaj does not cooperate they will intentionally, recklessly cause him to miss his flight.

102. From Morocco, UK, HAJJ, and Canada Wahhaj's travels all ended the same with intrusion and constitutional violations.

103. Wahhaj documented those constitutional violations by filing a law suit against ICE in 2005. ( See law suit Doc. : 1: 05-CV-01851- RJD-LB)

104. All of these statements can be corroborated by viewing defendant's passport for dates, subpoena ICE's reports and filing a TRIP complaint.

105. The FBI used law enforcement agencies to besiege, help conduct illegal investigations and violate Wahhaj's constitutional rights.

106. On August 3, 2018 Sheriff Hogfre ( Affiant) executed a manufactured search warrant on defendant's residence in Amalia New Mexico.

107. The Affidavit's factual basis contained various false statements and material omissions. Specifically, the Affiant averred that on May 15., 2018, he became aware of a missing child bulletin from Clayton County, Georgia and that Siraj Ibn Wahhaj ( Mr. " Wahhaj" ) and his son, Abdul- Ghani Wahhaj ( "AG"), may be residing in New Mexico ( "N.M"). (Exhibit A, BN 23617).

108. The Affiant, however, was aware much earlier than May 15 that Mr. Wahhaj and his son may be in New Mexico. Indeed, on January 2, 2018, the Affiant sent Taos County Sheriff's Office ( " TCSO") Sergeant Jason Rael an email indicating Mr. Wahhaj may have abducted his son, AG who suffers from Hypoxic Ischemic Encephalophy ( HIE), and it was unknown if his son had been receiving his medication. Affiant also averred that the child is described as having a "limp," but the Affiant knew AG could not walk. Ironically, the Affiant attached two documents to his affidavits that contradict his statement and regarding a "limp" as both documents indicate that AG's mother stated AG" cannot walk." ( Exhibit B. BN 233790)

109. The Affidavit goes on to described law enforcement's purported investigation, noting that during the investigation, TCSO officers Flores and Rael received information, on an unknown date, that the father, child, and others may be residing at at property in Costilla, N.M. ( Exhibit A, BN 23617). Affiant wrote that officers traveled to Costilla, N.M. Where area residents told the officers that persons who ' resemble" Mr. Wahhaj and his son occupy a property on juniper road. ( Exhibit A, BN 23617).

110. TCSO arrested Wahhaj, Lucas Morton, and the women, children were taken to CYFD initially.

111. The women was then illegally separated from their children and placed in CAV. Alelis Kostich on cross examination of sheriff Jerry Hogfre. Q. Okay. So they were taken into custody without incident? A. Largely. The two males... please understand the females were not charged on the 3rd , on that first day.

They were not taken into custody. That didn't happen until after further investigation, Safe room, and so forth had led us additional information believing that they had involvement with the health and welfare of the child; that they certainly were not held against their own will. They, therefore, making in the absence of those statements, they were an active participant in the treatment of these children. (Taos detention hearing page 41 lines 8-14)

112. Defendant's family were illegally evicted from their residence.

113. TCSO SGT Rael had a conversation with defendant's family on August 3, 2018 at CYFD.

114. The following is a summary of my conversation with the adult females, at CYFD, August 3, 2018. It is not intended to be a verbatim account and does not memorialize all the statements made during my conversation at CYFD, August 3, 2018. I did explain the reason for my contact with them was the property owner Jason Badger, wanted his property back. I also explained I was aware of the fact Lucas Morton has been to court and the case was dismissed. I explained I had checked with Taos County Assessor's office and the land they had built their home on did belong to Jason Badger. I advised them I was going to issue them a non- traffic citation for trespassing. I did also advised them I was the citation was going to be a summons to court and that by signing the citation it was not an admission of guilt, but rather a promise to appear. I also advised them the reason for the citation was that Jason Badger had withdrawn his consent for them to be on his property.

I advised the females that I was not going to go further into questing regarding the reason we had to remove then from the property. I did advise them the main reason we were at the property was the fact we were looking for AG, and the last indication we had was he was last known to be with them, but we did not find him. I advised them Siraj Wahhaj had a warrant issued for his arrest, and that's why he was taken into custody. I advised them he was held at ADC, and also charged with a state charge of being a fugitive from justice. All three females appeared to not have knowledge of Siraj having a warrant. Jany Leveille asked about child custody and stated Siraj had joint custody, she was not clear as to why Siraj was charged with kidnapping his own child. I advise the only knowledge I had was from detective in Georgia. I did also advised the three of them Lucas Morton was held at ADC. I then advised them CYFD was involved in the case and they have their own process, but the children will be receiving food and clothing. During my time speaking to the females CYFD Tony Barajas entered the room. I handed out the citations and asked them if they had a New Mexico mailing address, They told me they did not have a mailing address. The three signed the citation and I provided

them a copy of their citation. This was the extent of my interactions with the three females at CYFD. ( Bates 2720 page 31 Sergeant Jason Rael report)

115. On or about June 12, 2018, I was made aware J. Badger had filed civil processes paperwork at TCSO in an effort to have Lucas Morton removed from the property, Sgt. Gilbert Atencio placed the paperwork on my desk as he knew I was working this case. I then advised Undersheriff Steve Miera of the civil process and he advised to place the paperwork in his box, and he would take care of it. I don't recall the date I received information the civil process regarding the J. Badegr case was dismissed by Magistrate Judge E. Ortega. I was also made aware J Badger called NMSP and asked officer to assist in going to his property and evict Lucas Morton. NMSP Sgt. Cox told me a NMSP uniformed officer drove up the compound and was met at the roadway by Lucas Morton. Lucas Morton was by all accounts nice to the officer and the officer left the property without incident. ( Bates 2714 Page 26 Sergeant Jason Rael report)

116. There are several important points in this report that needs to be unpacked. 1) Sgt. Rael confirmed Jason Badger attempted to evict defendants from the property but the case was dismissed . 2) He failed to include in his report that the case was dismissed with prejudice. 3) Defendants established residency on the property they were living there for more than 6 months. 4) Sgt. Rael did not state in his report it was a hazard to leave the women, children on the property and they had a court order signed by the magistrate judge ordering their removal. 5) Undersheriff Steve Miera illegally persuaded a neutral Magistrate Judge E. Ortega to dismiss the civil case without allowing J. Badger to exercise his due process rights. 6) TCSO intentionally, recklessly denied J. Badger due process rights in order to further the investigations. 7) When it was beneficial to deny J. Badger's civil process rights TCSO did not hesitate in order to further the investigation. 8) Sgt. Rael stated I advised them I was going to issue them a non- traffic citation for trespassing. I also advised them the reason for the citation was that Jason Badger had withdrawn his consent for them to be on his property. This was a false pretense to illegally removed defendants from the property. 9) There would be documentation in the courts of J. Badger civil filings, magistrate Judge E. Ortega dismissal with prejudice and a report on NMSP officer traveling to Subject Property. ( See J. Badger civil filings Case No. M-53-CV-2018-00076 ) 10) J. Badger filed civil process on June 12, 2018, Lucas Morton was served on June 18, 2018, dismissed with prejudice on June 27, 2018, disposition for lack of prosecution. 11) There was no Writ of Restitution just an illegal removal from defendant's residence. 12) Sgt. Rael advised the females that he was not going to go further into questing regarding the reason they had to remove the defendants from the

property. He knew the removal was illegal he did not want to entertain any questing to why defendants were forcibly being removed.

117. N.M Stat. Ann.§ 47-8-37 Notice of termination and damages 47-8-46. Writ of Restitution is defined as the act or process of legally dispossessing a person of land or rental. N.M. Stat. Ann.§ 47-8-3

118. Mr. Krache on direct exaltation of SA Taylor. Q. Now, after they all arrived in Amalia, New Mexico, did they establish a residence there? A. They did. Q. Okay. And was there already any kind of residence there? Any kind of dwelling? A. No ( See detention hearing in Albuquerque )

119. Jason and Tanya Badger had a real estate sale and purchase agreement signed in by J. Badger on April 5, 2018, Tanya Badger on April 12, 2018, and Lucas Morton April 18, 2018 ( See Real Estate Sale and Purchase Agreement )

120. At that point the females were not charged with child abuse.

121. In order for TCSO to legally separate defendant's children from their parents TCSO needed justification .

122. This is when the unholy illegal alliance started to take shape.

123. TCSO filed false child abuse charges against defendants, separated the children from defendants, placed the defendant's children in the care of CYFD, CYFD delayed 4 days in filing a petition of abuse in violation of NMRA 10-312, CYFD illegally allowed the FBI to interrogate defendant's children without their parents knowledge, written or verbal consent, nor counsel being present, nor without their Miranda rights read, nor without a court order. On cross examination of SA Taylor by Mr. Clark. Q. Good afternoon. A. Good afternoon. Q. So the children, F.L. And J.L., one is thirteen and one is fifteen? A. Yes, sir Q. And was any guardian or any of their parents present when you spoke to them? A. CYFD were his guardian at the time and they consented to bring him to the FBI space and a separate interview was done at CYFD, brought by foster mom at the time. Q. So nobody from either one of these boys' real families were there when they were talked to by the FBI, right? A. Correct. Q. Okay. So the fact is you, or whoever, law enforcement, spoke to these fifteen-year-old and thirteen-year-old, they would have been separated from any member of their biological family or [inaudible 02:34:52] family, correct? A. Correct. ( See Taos detention hearing Pages 69,70 lines 23-28 and 1-12)

124. From these Due Process violations manufactured terrorism charges was filed against defendants.

125. TCSO seized defendants children on August 3, 2018, placed them on a 48 hour hold, filed criminal child abuse charges on August 5, 2018, dismissed on August 23, 2018.

126. CYFD filed civil child abuse charges on August 7, 2018 4 days after TCSO seized defendant's children in violation of NMRA 10-312, order to gain information to further the investigation.

127. NMRA 10-312 B. **Time limits** if a child is taken into custody, a petition alleging abuse or neglect shall be filed by department within two (2) days from the date that the child is taken into emergency custody by the department. If a petition is not field within the time set forth in this paragraph, the child shall be released to the child's parents guardian or custodian.

128. CYFD forced defendants to relinquish their parental rights on December 10, 2018. Defendants were never found guilty of child abuse.

129. TCSO illegally entered defendant's property with a manufactured falsified search warrant.

130. The Affiant lied multiple times on his sworn affidavit deceiving a neural judge Sarah Backus into establishing probable cause when in fact probable cause did not exist.

131. The Affiant executed an illegal search warrant, manufactured false charges of child abuse, seized defendant's children, placed them with CYFD in order to conduct safe room interviews to further the investigation. CYFD allowing the FBI to interrogate, coerce defendant's minor children without reading them their Miranda rights, having an attorney present, nor without their parents consent and knowledge.

132. On direct examination of SA Taylor by Mr. Hassan. Q. Okay. And did you have occasion recently to interview one or more children who were taken into custody by the New Mexico Children, Youth, and family Department last week, approximately? A. Yes, sir. Q. Okay. And what was the purpose of your interview ? A. We were assisting the Sheriff's Department. Q. Okay. And can you tell me..... you can just..how many children did you interview? A. Just two. Q. Okay. And tell me about the first one and you can just use initials, if

you want. What are the child's initials? A.F.L. Q. Okay. And when did you first interview F.L.? A. August 7th . ( Taos detention hearing Pages 61,62 lines 24-28 and 1-9)

133. SA Taylor testified that the FBI was assisting TCSO with the investigation. That is why he illegally interrogated defendant's children. It was the Affiant's belief by prolonging the charges in order to give CYFD time to conduct safe room interviews in order to further the investigation. (Exhibit G Affidavit for second search warrant)

134. The FBI repeatedly coerced defendant's minor sons into the narration the FBI needed to bring charges against defendants.

135. SA Taylor and SA Hartman made one of the minor boys cry due to the intensity of the interrogation and the boys not being truthful to them.

136. The FBI repeatedly questioned defendant's children for hours on multiple dates. Ms. Bhalla on cross examination of SA Taylor. Q. Good afternoon agent Taylor. A. Good afternoon. Q. Agent Taylor, you mentioned on your testimony that you did a number of interviews in this case of some of the witnesses, as you called it, from the compound. One of those witnesses was F.L? A. August 7th , 9th and August 21st. Q. And who else was present with you? A. August 7th , CYFD brought- we were at CYFD on August 21st , and CYFD brought F.L. to talk to me. Q. Did CYFD sit in on the interview? A. On August 21st , CYFD was observing through a two- way mirror. Q. Okay. And what about on August 7th ? A. On August 7th , it was myself and another agent. Q. Which other agent was present with you? A. Sam Hartman. Q. And were there any other adult present in the room, either a legal guardian or foster parent? A. No. Q. And what about on August 9th ? A. Not originally, then the foster mom did come in during another portion of the interview. Q. Okay. And when- how old was F.L., can you remind me? A. 15. Q. 15? Okay. So, far at least the first interview, F.L. was interviewed by two agents on August 7th , with no legal guardian present. Is that correct? A. CYFD brought F.L. but in room, no. Q. Okay. And there was no CYFD or other legal guardian present during the interview on August 21st , is that correct? A. CYFD was observing through the two-way window, but they were not ( indiscernible, audio sips). Q. And on August 9th , a foster parent was present? A. For a portion of the interview. Q. The first portion or the second portion? A. It was for clarify question at the end of the interview. Q. Okay. And so the foster parent was only present for the end of the interview. Is that correct? A. Correct. Q. Okay. How long did each of the interviews last? A. August 7th , approximately a few hours. We took breaks.

And August 9th , was approximately one or two hours. And August 21st , was approximately one or two hours. And August 21st , was approximately one or two hours as well. Q. Were each of those interviews recorded? A. Yes. Q. Okay. And where did the interviews take place? A. On August 7th , it was at the FBI space in Santa Fe. Q. I'm sorry, FBI what? A. The FBI office in Santa Fe. Q. Okay. Thank you. A. On August 9th , it was at CYFD in Taos. And on August 21st , it was also at CYFD in Taos. Q. Okay. And you mentioned that you also interviewed another witness from the compound. J. L. is that correct? A. Yes ma'am. Q. Okay. And what dates did you interview J.L.? A. August 9th and August 21st .

Q. Okay. And how old is J.L.? A.13.Q. 13? And where did the interview on August 9th take place? A. CYFD Taos. Q. And who else was present in that interview? A. I was the only adult present, and then the foster mom came in with the two boys, or F.L. and J.L,. in the latter part of the interview. So at the end of – at the end of the on August 9th , when the foster parent stepped in, am I understanding correctly that F.L. and J.L. were together? A. Yes, they both came together with their foster mom. Q. And they both answered question together? A, Yes. Q. Okay. And that interaction was also recorded? A. Yes. Q. Audio or video? A. Audio. Q. Okay. And tell me where did the interview on August 21st take – where did where did the interview on August 21st take place? A. CYFD. And were there any other adults present in the room during the interview? A. CYFD was just observing through the two- way mirror. No adults other than myself and Task Force Officer. Q. And who was the Task Force Officer? A. Kim Strafella From New York. Q. Can you spell her last name for me, please? A. I will ( indiscernible, audio skips) R-A-F-E-L-L-A. Q. Okay, and she's a Task Force Officer? A. Correct. Q. So a 13-year-old met with two agents at CYFD, without a parental guardian present in the room. Is that correct? A. Yes. Q. Okay did you interview any other witnesses from the compound that were children? A. Yes. Q. Can you please give me the initials of the children that you interviewed and their ages? A. A. W.., eight- year- old, eight years old. N.W., I believe that last name is W., eight years old. And I do not recall the name of the third child, but only who the child belongs to. Q. Would the government have an objection to identifying who the child belongs to? MR. KRAEHE. No. objection. Q. (By MS. Bhalla) Could you identify who that child belongs to? A. Jany Leveille. Q. And how old was the child? A. Eight as well. Q. Okay. So the – and those are the only other children that you interviewed? A. Yes. Q. Were three eight- year- old's? A. Three eight- year- old's, 13 and 15. Q. Okay. I want to talk to you a little bit about those interviews with A.W., N.W., and Jany Leveille's child. Could you please tell us when the interview took place with A.W.? A. August 22nd , I believe, is the date. Q. Okay. Is that the only other time? A. Yes. Q. Okay. And where did that interview take place? A. CYFD. Q. And who was present in the room for that interview? A. Kim Strafella, a forensic- child forensic interviewer and CYFD

was observing through a two- way mirror. Q. So you- so let me make sure I understand this. So you and officer Strafella- Is that how you say it. A. Detective Strafella. Q. Detective Strafella were present in the interview room, but there was no legal guardian or a parent accompanying the eight-year-old- child. Is that correct? A. CYFD was observing through a two – way mirror and there was no other guardian inside the room.

Q. How long did that interview last? A. I believe it was approximately 40 minutes. Q. Was that- was that encounter recorded? A. Yes. Q. Okay. Audio or video? A. Audio. Q. what about the interview with N.W., when did that take place?. A. August 22nd as well. Q. And is it the same situation that you and detective Strafella were in the room? A. Correct. Q. And they were no adults present on the room with the minor child? A. Correct. Q. How long did that interview last? A. I do not recall exactly, but I believe it was under an hour. Q. And was that encounter rerecorded? A. Yes ma'am. Q. Audio or video? A. Audio. Q. Okay. And this interview also took place at CYFD in Toas? A. Yes ma'am. Q. Who transported the children to the interview. A. I'm not exactly sure. Q. And when did you interview Jany Leveille's eight-year-old child? A. August 22nd as well. Q. A. Same day ?A. I believed it was the same time frame, but I don't remember the exact dated. Q. And was it audio- recorded? A. Audio- recorded, yes. Q. Okay does that encompass all of the interviews of the minor children that you've taken in this case? To the best of knowledge, yes. ( Detention hearing in Albuquerque September 2018 Pages 66-75)

137. Even when defendant's minor children said no to FBI created allegations. The FBI asked leading questions, rephrased the same questions , and used terminology the boys did not understand. Mr. Ives on cross examination of SA Taylor. Q. Now when you interviewed J.L. and F.L., you asked them leading question. Is that correct? A. I don't believe I did, or attempted not to. Q. Do you know whether you asked them leading questions ? A. You have to tell me specifically what you' re referring to. Q. You can't testify to your memory, one way or another, whether you asked asked those boys leading questions when you interviewed them? A. The purpose of my interview was to attempt not to ask a leading question, so it would be their own words. Q. Did you pressure them by telling them they were the only ones that could help with your investigation? A. I don't remember those exact words. I remember saying you wouldn't be in any trouble here today, talking about how doing the right thing- about doing the right thing. There was discussions on August 7th with F.L. about- talking about what movies he likes, he says he likes Captain America, and we talk about some of the ideals of Captain America and then he proceeded to tell us what he-he said he was telling us the truth after that.

Q. when they- when they children didn't give you answers you wanted them to give you, you would ask them leading questions, wouldn't you? A. Can you refer to specific time? A. I'm just asking you. A. There was a time when they lied when they saw A.G., and we say we already knew the answers to the questions we're asking you, and it would really ( indiscernible) for them to tell us the truth and then ( minor's name, F) began to-- cry and tell us what happened to A.G. in detail. Q. And also when you weren't getting the answer that you wanted, you told them that they were the only ones who could help you, right? You needed their help. A. I believe we asked for their help, yes. Q. Did you tell them they were the only ones who could- who could help you? A. I cannot recall the exact words they used. ( Detention hearing in Albuquerque September 2018 pages 114, 115 )

138. Defendant's federal charges all stem exclusively from those illegal interrogations of defendant's minor children without defendant's knowledge, written or verbal consent, nor without a court order. Ms Bhalla on cross examination of SA Taylor. Q. Okay. I want to move forward a little bit to your testimony about when defendants left Georgia. You prepared a number of Affidavits for search warrants in this case. Do you recall that? A. Yes ma'am. Q. Okay I believe that one was filed on August 16th . Is that correct? A. I don't recall the exact dates. Q. Does it sounds about right? A. Approximately, yes. Q. Would it help to fresh your memory if I handed you a stack of your Affidavits for search warrants? A. Sure. Q. Okay. And then maybe you can identify the date? May I approach, Your Honor. THE COURT: You may. Q. ( By Ms BHALLA) Does that refresh your recollection, agent Taylor, as to when-A. Yes ma'am, it says August 16th .Q. Okay. So one of those search warrants was prepared on August 16th . is that correct ? A. That's what it says. Q. Okay. Do you have any reason to doubt that that's when you filed them? A. No ma'am. Q. And that- and we can go through the rest of these later, but is it fair to say that you relied heavily on the statements that you took from F.L. and J.L. in preparing these Affidavits? A. In several of the Affidavits, those testimonies are there, as well as Jany's book. Q. Okay. So it's fair to say, then that you ( indiscernible, audio skips ) J.L. and N.L. statements to prepare your affidavits for the search warrants? A. Yes, ma'am. (Detention hearing in Albuquerque September 2018 Page 75 Lines 9-18)

139. There was no independent corroboration of defendant's minor children's coerce statements. Ms. Sirignano on cross examination of SA Taylor. Q. When you interviewed the children, a few – the 13-year-old and the 15-year-old, I

believe – initially denied seeing A.G. In New Mexico, correct? A. That is correct. Q. So, initially, their statements to law enforcement were untrue, correct? A. That would be correct. ( Detention hearing in Albuquerque September 2018 Page 102 Lines 11- 17)

140. This is something all of defendant's counsel knew and never launched a collateral attacking this fallacy.

141. Defendant was being investigated since 2003 nationally and internationally yet that long, intrusive, unconstitutional, expansive investigation did not turn up any charges until the illegal coerced interrogation of defendant's minor children.

142. The FBI illegal interrogation of defendant's minor children was not egregious enough. The FBI intentionally, recklessly omitted exculpatory evidence to mislead the grand jury to charge defendants.

143. The FBI initially needed to charge defendants in order to detain them while the FBI continued to build their case.

144. Most of defendants were already released from Taos County Detention, that case was dismissed.

145. The FBI were racing against the clock, so they used all illegal means to hold defendants.

146. The FBI intentionally, recklessly omitted from the criminal complaint and grand jury indictment that Jany was legally in the country and had deferred status. SA Adelfa Garcia swore on his affidavit that Jany would be consider unlawfully in the United States when her visa expired, in other words, six months after her entry into the United States B2 Visitor on June 24, 1998. at present, Jany does not have any pending application and no pending deferred action. On June 24, 1998, Jany entered the United States at New York City, NY as a non- immigrant B-2 visitor and was admitted for a period not to exceed six (6) months. After this visa expired, Jany received no subsequent visas or authorization to remain in the United States. On March 6, 2017 Jany submitted I-765, Application for Employment Authorization.

On April 20, 2017,United States Customs and Immigration Services (USCIS) approved the application. On April 16, 2018. Jany's Employment Authorization Document (EAD) expired no new application has been filed. On May 1, 2017 Jany submitted and I-485

application to adjust her status. On June 29, 2018, the USCIS sent Jany a rejection notice. USICS Atlanta confirmed that Jany's I-485 application for permanent residency was denied. Jany abandoned her application by failing to appear to two scheduled interviews. At the present time Jany is without lawful status. (See Doc.1 SA Garcia Criminal Complaint )

Compare his falsified sworn affidavit to the actual immigration documents file number 088372419 from Jany's true immigration status. On August 7, 2018 information on Leveille was received from the Albuquerque FBI office. The Albuquerque FBI office indicated that Leveille was born in Haiti and requested that her immigration status be determine. On August 8, 2017 the Taos Sheriff office contacted ERO to determine alienage of Leveille. Immigration History on June 24, 1998, Leveille's last documented entry the United States was on or near New York City, NY as a B2 visitor On April 17, 2006 Leveille submits an I-360 petition under the name Jany Louis Jacques. On October 31, 2007 USCIS sent approval notice I-360 petition. On May 1, 2008 Leveille submits I-485 application to adjust status to permanent resident. On May 16, 2008 Leveille submits I-485 application to adjust to permanent resident. On July 28, 2008 USICS sent rejection notice for I-485 application. On December, 2008 USICS sends approval notice for I-130 petition. On May 1, 2017 Leveille submits I-485 application to adjust status to permanent resident. On April 16, 2018 Leveille's Employment Authorization Document expires. On June 29, 2018 USICS sent rejection notice for I-485 application Office of the Chief Counsel indicated that if Leveille was issued the Employment Authorization Document (EAD), by USICS, under deferred action based on the approved I-360 petition, Leveille may not be amenable removal. Form I-797, notice of action dated October 31, 2007 indicates that Leveille was granted deferred action for a period of 15 months from the date of notice. The I-797 notice indicates that in order to extend deferred action Leveille would either have to submit a request in writing for an extension or have an approval form I-765 for employment authorization. As stated above, Leveille's Employment Authorization Document expired on April 16, 2018 and there is no record found that Leveille has filed form I-765 to request an extension of employment authorization or submitted a written request. Based on this information Leveille no longer has deferred action as her I-485 was denied and her EAD expired in April 2018 a long with no record of requesting an extension. With OCC concurrence Jany Leveille will be placed into immigration proceeding.

This document clearly shows that not only did SA Garcia knew Jany Leveille was legally in the U.S. and had EAD authorization approval from October 31, 2007 and she renewed it continuously each year until it expired on April 2018. Her deferred status was adjusted. TSCO and FBI both knew Jany's true status. SA Garcia intentionally, recklessly omitted Jany's true status in order to manufacture criminal charges. SA Garcia intentionally, recklessly left out every application Jany filed and was approved from

1998 to 2017. SA Garcia swore to the veracity of the complaint which he intentionally, recklessly committed perjury.

147. Amazingly enough SA Taylor knew SA Garcia's Criminal Complaint was false. On Ms. Converse cross examination of SA Taylor: Q. Agent Taylor, towards the end of your testimony, answering Mr. Krache's questions, you said that my client was- had entered the country on a visitor visa and had been out status for 20 years? A. I believe I said that she's been out of status for 20 years. Q. She entered as a 15-year – old with her mother, didn't she? A. To the best of my recollection, that's what I know (Indiscernible) Q. And that was in 1998? A. I don't know the exact date. Q. You wrote that date in your- A. It was approximately 20 years ago. Q. Okay. A. And I believe that that is the date, but I don't recall from that time period. Q. And nine years after that, in 2007, she applied for and received protection under the Violence Against Women Act, which is a temporary immigration status, didn't she? A. I do not know-- I don't recall that exact fact. Q. You knew that she received it at some point, if not in 2007? A. I know she received-- or applied for several visas during her time here, but I do not recall exactly what for. Q. And she got – your Complaint Affidavit mentioned one time when she applied for a renewal of employment authorization, but there were actually many times when she renewed that, didn't she? A. Are you talking about the arrest Complaint? Q. Yes the Criminal Complaint, document 1 in this case. A. I did not swear to that Compliant. Q. Okay. Were you consulted on it? A. To a degree, yes. Q. Do you believe-- is any of the information in there inaccurate? A. Not to my knowledge, no. Q. Are you aware that she applied for renewals of her employment authorization from the Immigration Service repeatedly? A. From the best of – to the best of my knowledge, yes. Q. And one of those times was March 3rd of 2017. Is that right? A. I do not know the exact date. Q. Okay. If that's the date in the Complaint, would you dispute that? A. No. Q. And if the Complaint said that that was approved by Immigration Services on April 20th of 2017, you wouldn't dispute that date, would you? A. I would not dispute that date.

Q. And a little after that, she files another Application for adjustment of status. Isn't that right? A. I believe that's correct. Q. That would be May 1st , according to the Compliant? A. I would not dispute that. Q. And adjustment of status is changing from a non-immigration status to a permanent resident status. Is that right? A. To the best of my knowledge, but I'm not an immigration official. I don't know exactly how it works. Q. And on April 16th of this year, her last employment authorization expired. Is that true? A. To the best of my knowledge. Q. And then after two months after that, her adjustment of status was denied because she failed to appear for a hearing. Is that right? A. To the best of my knowledge. Q. Do you know where the notices of that hearing were sent? A. I do

not. Q. Do you know whether they were sent to New Mexico? A. I do not. Q. Or Alabama? A. I do not. Q. So you don't have any knowledge whether she ever received it? A. Not to my knowledge. ( Detention hearing in Albuquerque September 2018 Pages 84-87 )

148. SA Taylor is the case agent in this case. He knew the Criminal Complaint was false that is why he did not swear to it. He was consulted for this case, he knew Jany applied for and was approved for multiple (EAD) from October 2007 to April 2018. It was the FBI Albuquerque office who sought Jany's Immigration status in August 7, 2018 and received her status on August 8, 2018. He testified that Jany was out of status for 20 year, he intentionally, recklessly lied. Mr. krasgree on direct examination of SA Taylor: Q. And do you have any knowledge regarding her immigration status? A. Per Immigration Enforcement agency, she's been out of status for approximately 20 years. Q. And to your knowledge is she unlawfully and illegally in the United States? A. Yes sir. (Detention hearing in Albuquerque September 2018 Page 55 lines 10-16 )

149. The intentionally, recklessly perjury committed by these law enforcement officials has no bounds. He knew the facts of the criminal complaint was false and inaccuracy underscores the misconduct. He is responsible for the conspiracy to violate defendant's constitutional rights. He intentionally, recklessly knew the veracity of the facts in the criminal complaint and the indictment was false that is why he did not swear to them.

150. The prosecutor committed abuse of the grand jury by deliberately withholding from the grand jury material and exculpatory evidence of which they had knowledge thereby creating false impression of the evidence to the grand jury. In violation to this commitment, and without any proper justification. The government placed before the Grand Jury a barred from prosecution by the commitment. This mass of information also improperly prejudice the Grand Jury and so vitiated its independence that Mr. Wahhaj has been denied his right to be free from indictment except by an impartial finding of probable cause as guaranteed by the Fourth and Fifth Amendment's to the Constitution. SA Taylor presented perjured information before the Grand jury. The Grand jury returned an indictment. Magistrate judge Khalsa used the Grand jury findings of probable cause to detain Wahhaj and Co defendants pending trail denying them Due Process. ( Detention hearing in Albuquerque September 2018 Pages 160,161 lines 21-25, lines 1-4 )

151. The total conduct of the United States officials and SA Taylor, Garcia

officials acting as agents of the United States officials or independently as they relate to the defendant are such a nature as to both shocking and offense to American notions of justice. Continued judicial proceedings in this cause will make the court a party to such illicit and immoral conduct and will cause it to become negligent in its duty to supervise the administration of justice in federal criminal cases brought before it. Mr. Wahhaj suffered great prejudice as a result of the government's action.

152. SA Travis on cross examination stated that he did not swear to the complaint. He did not swear to the complaint because he knew it was false.

153. These were not harmless errors that the court can overlook. These were intentionally, recklessly, constitutional violations that caused defendants irreparable harm.

154. If it was not for the depraved actions of the FBI,TCSO and CYFD defendants would not have suffered, loss of freedom, contracted the deadly contagious disease COVID- 19, separated from their children for 4 years, property dismantled, children in therapy from the psychological torture from the illegal separation, devastating financial losses from defendant's businesses, characters maligned in the media.

155. TCSO knew it was illegal to interrogate defendant's minor children without their parents consent, nor an attorney present. That is why TCSO seized defendant's children, placed them in the care of CYFD, CYFD waiting 4 days to file a petition of abuse in violation of NMRA, CYFD allowing the FBI to interrogate the children. TCSO thought by involving inter agencies it would relieve them of the constitutional violations, that is further from the truth. TCSO, FBI and CYFD all conspired to violate defendant's constitutional rights.

156. TCSO filed criminal abuse charges on August 5, 2018, stating defendant's did not have running water or food. In fact TCSO knew defendants received fresh water from their neighbor's well. J. Badger answered the phone and stated he was up in Amalia, NM. He was watching Lucas Morton getting water. ( Bates 2715 Page 27 Sergeant Jason Rael report)

157. J. Badger stated there is a guy " Kenny" who helps out Lucas Morton from time to time. ( Bates Page 24 Sergeant Jason Rael report )

158. John would drive Lucas wife to the dollar store weekly to buy provision. ( Bates Page 24 Sergeant Jason Rael report )

159. It is the FBI who blocked J. Badger from evicting defendants. On July 15, 2018, J. Badger asked if he did help and the missing boy ( AG) was not there, how long it would be before he got his property back. J. Badger stated he already gone to NMSP to evict the people from the property and were trumped by the FBI. ( Bates 2715 Page 27 Sergeant Jason Rael report )

160. There was no nexus that Wahhaj or AG were at the property. On July 15, 2018, I stated to NMSP Sgt. Cox I felt we had expended a large amount of time and resources on this case and I did not know how much further we could proceed given no solid concrete evidence Siraj Wahhaj and AG were at the compound, but we would exhaust all measures and leads. ( Bates 2715 Page 27 Sergeant Jason Rael report )

161. SA Travese Taylor, SA Garcia, Sheriff Jerry Hogfre all falsified sworn affidavits in order to further the investigation depriving defendants from their constitutional rights to Due Process.

162. If it were not for the actions of the FBI opening up an illegal investigation on Wahhaj since 2003, using other law enforcement agencies to pursue an investigation, poisoning TCSO whom had no interaction with defendant prior to the FBI requesting their assistance. TCSO stated to J. Badger that defendants are violent extremist, eliciting TSA, TCSO, CYFD and foreign governments to further their investigation. There would have not been any continued harassment every time defendant traveled abroad, defendants would have not been incarcerated for 4 years, deprived from their children for 4 years, maligned in the media, great economical losses from businesses.

163. This court can correct this miscarriage of justice. The FBI, TCSO, and CYFD all disregarded defendant's constitutional rights contrary to the oath all these law enforcement officials took. Defendant in seeking relief from the oppression perpetrated by these entities.

I swear under penalty of perjury that these statements are true and correct.

7/27/22

STATE OF NEW MEXICO
NOTARY PUBLIC
SANDRA SERRANO
Commission # 1130567
My Comm. Exp. Sept, 14, 2024

Sandra Serrano

[signature]
00414151 Siraj Wahhaj

Siraj Wahhaj #00414151
P.O. Box 3540
Milan, New Mexico 87021

US PC
ZIP 87
02 4W
0003

Legal Mail

RECEIVED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

NOV 14 2022

MITCHELL R. ELFERS
CLERK

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL®

3423

Pete V. Domenici U.S. Courthouse
333 Lomas Blvd. NW, Suite 270
Albuquerque, NM 87102




PRIORITY® ★ MAIL ★

PRIORITY® ★ MAIL ★

...duct is for use with Priority Mail.® ...may be a violation of federal law. ...his label is not for resale.