IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 18-2945 WJ |
| | ) | |
| LUCAS MORTON, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>UNITED STATES' SENTENCING MEMORANDUM</u>**

The United States respectfully submits this sentencing memorandum and requests that the

Court impose the mandatory sentence of life imprisonment for Defendant Lucas Morton (Morton).

I.     <u>FACTUAL AND PROCEDURAL HISTORY</u>

On October 17, 2023, after a nearly month-long trial, a jury returned a verdict finding

Morton guilty of Conspiracy to Provide Material Support to Terrorists, Providing Material

Support to Terrorists, Conspiracy to Murder an Officer or Employee of the United States,

Conspiracy to Commit Kidnapping Resulting in Death, and Kidnapping Resulting in Death.

Doc. 1016.   These crimes were in violation of 18 U.S.C. §§ 2339A, 117, 1201(c), 1201(a), and

2, and the kidnapping charges carry a mandatory sentence of life imprisonment.   *See* Doc. 85.

A presentence reports (PSR) for Morton was disclosed on January 31, 2024 (Doc. 1100),

and the United States has no objections to it.   The PSR calculates Morton's total offense level

as 43 and his criminal history category as VI, resulting in a guideline imprisonment range of life

imprisonment, and it recognizes that the kidnapping crimes require a sentence of life

imprisonment without release.   *Id*. at ¶¶ 80-81.   Although the total offense level is 43, it is

worth noting that it would have been 51, a full eight levels higher—given the enhancements

Lucas properly received for promoting a crime of terrorism, being an organizer or leader, using minors to help commit the offenses, and because Abdul Ghani was a vulnerable victim—but the highest offense level under the Guidelines is 43.   *Id*. at ¶¶ 39-41, 47.   To date, Morton has not filed any objections to the PSR, nor has he filed a sentencing memorandum.

A sentence of life imprisonment is appropriate for Morton given his involvement in the kidnapping of Abdul Ghani as well as his role in providing material support to terrorists, conspiring to do the same, and conspiring to kill federal officers.   Although Morton faces a mandatory life sentence, the United States briefly addresses the 18 U.S.C. § 3553(a) factors as follows:

## II.   ARGUMENT

### A.   18 U.S.C. § 3553(a) Factors

Section 3553(a) continues to require sentencing judges to take certain factors, including "the kinds of sentence and the sentencing range established" by the Guidelines, into account when imposing a sentence.   18 U.S.C. § 3553(a)(4).   Taking into account the provisions of 18 U.S.C. § 3553(a), a reasonable sentence is one that "reflect[s] the seriousness of the offense, promote[s] respect for the law, provide[s] just punishment, afford[s] adequate deterrence to criminal conduct" and "protect[s] the public from further crimes of the defendant."   *See* 18 U.S.C. § 3553(a)(2)(B), (C); *see also United States v. Booker*, 543 U.S. 220 (2005).   A reasonable sentence also is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   *Id*.   Based on these factors, a sentence of life imprisonment is not only mandated, but appropriate for Morton.

#### 1.   The Nature and Circumstances of the Offense

The United States emphasizes the seriousness and extremely dangerous nature and

circumstances of Morton's offenses, and Congress has demonstrated that it views the crimes for which Morton was convicted as serious given the maximum and, in the case of the kidnapping charges, mandatory minimum sentences, that apply.   *See* 18 U.S.C. §§ 2339A, 1117, 1201.

It is difficult to overstate the seriousness of the offenses in this case.   After Siraj Wahhaj (Siraj) kidnapped Abdul Ghani from the young child's mother and primary caregiver, Morton assisted Siraj and the other three defendants in concealing Abdul Ghani, who was deprived of his medication and subjected to hours of ruqyahs, until he succumbed and died.   Morton and the others first concealed Abdul Ghani in Alabama, after hurriedly fleeing Georgia, and later in New Mexico.   It was Morton who provided the box truck and trailer that served not just as a means of transportation, but also as home of sorts for the entire group over a period of nearly nine months that the Defendants were fleeing and hiding from law enforcement and their other family members.

Abdul Ghani's tragic death, occurring in New Mexico several weeks after he was taken from his mother, did not make Morton and the others reconsider their actions.   Instead, Abdul Ghani's death gave the Defendants an opportunity to use his body as a prop in their end-of-times fantasies.

Starting even before Abdul Ghani died, Siraj and Morton, along with the other co-defendants, built a militarized compound (on land they were quickly informed that they did not own or have any legal right to occupy) in Amalia, New Mexico, for the mutually supportive purposes of (1) training for what they expected to be a war between themselves and those who joined them in following Jany Leveille (Jany) as the reincarnation of Mary, mother of Jesus, and those who rejected Jany and her followers, and (2) providing a safe haven within which the

Defendants could hide from law enforcement with Abdul Ghani and from which they could engage and kill federal law enforcement officers who came to arrest them.   After Abdul Ghani died at the compound, all of the Defendants, including Morton, remained at the compound with Abdul Ghani's body while they awaited his resurrection and leadership of the group in their planned societal-cleansing war.

Morton's intentions were aligned with the rest of the group, and in late December 2017, approximately one week after Abdul Ghani died, he personally delivered a recruitment letter written by Jany to Muhammed Wahhaj in Georgia.   *See* Doc. 917 at 9; Gov. Trial Ex. 23.   The letter implored Muhammed to take all his money out of the bank and bring his guns (just as the rest of the defendants had already done) to join the group in New Mexico, where he would have the opportunity to die as a martyr.   *Id*.   The letter stated in part:

> Allah says he will protect you always, so follow until he makes you die as a
> martyr as you wanted, and the only way is by joining the righteous (us).   You
> will meet Isa also here in about four months in sha Allah.   So hurry, do not drag
> your feet.   Leave whatever we told you to leave and follow what Brother Luqman
> is telling you.   Take all your money out of the bank and bring your guns.   And
> whatever you will say to your dad will be a waste of time right now and will put
> all of us in danger.   So don't.

Tr. 946:9-17 (Exhibit 23.)

Captain Scott Stubbs testified that he made contact with Morton shortly thereafter, told Morton the police were investigating the disappearance of Siraj and Abdul Ghani, and asked if Morton knew their whereabouts, to which Morton responded, "No."   Tr. 948:8-949:2; 956:7-13; 970:10-13.   Morton lied to Cpt. Stubbs despite knowing full well that Abdul Ghani had died, and, at that time, his body was being stored in the trailer, under the bed where Hujrah slept.

The Defendants were preparing for a war with corrupt institutions, and in anticipation of

the war they were planning to initiate, the Defendants, including Morton, provided material support in the form of weapons, training, personnel, and finances.    Jany authored a book, with assistance from Hujrah Wahhaj (Hujrah) and Subhanah Wahhaj (Subhanah), explaining what she and the co-defendants were doing, what they were planning, and why.    The book was meant to be a manifesto or a testament that the group would use to announce themselves and convert people to their cause, but the book also warned about what would happen to those who did not convert or join the group, and all of the defendants knew about the book.    *See* Gov. Trial Ex. 11.

Although Jany and Siraj may be characterized as the primary leaders of the group, Morton, like Hujrah and Subhanah, played an important role that was instrumental in the group carrying out their plans as far as they did, and his actions were in line with Jany's prophesies. Perhaps the group never would have made it to New Mexico but for Morton providing the box truck and trailer.    Once the group was in New Mexico, Morton and Siraj were instrumental in the design and construction of the militarized compound built by the group, as well as the weapons and tactical training conducted for the "Army" that would help carry out the attacks on nonbelievers and members of corrupt institutions, to include federal officers and employees.

Moreover, Morton knew that the group's plan was to shoot law enforcement officers if they ever came to the compound, and he alerted Siraj and the others the day officers did come to the compound to check on the welfare of the many children living there—August 3, 2018.    On that occasion, Lucas had to have known that Siraj would arm himself with multiple firearms, intending and prepared to engage in a shootout with law enforcement, and a firearm in the box truck was accessible to Morton.    Fortunately, Jany ordered Siraj to stand down, and a violent

confrontation was narrowly avoided.

The intensive effort exerted into making the compound a hardened, militarized safe haven underscores the seriousness with which Morton and the group took their collective plans and mission, and it confirms that the Defendants were not simply trying to get away from who they believed was a horrible, black-magic conjuring, baby-stealing Hakima Ramzi to live peacefully off the land in Amalia.   Instead of making the compound a comfortable or safe space for the many small children who had to live there for many months, the Defendants hand-dug a 100-foot escape tunnel and spider-hole with weapons staged at the end, built numerous fortified firing positions, switchback entries with "kill box" false corridors in surrounding walls, and a full-sized tactical training range, on which the group could train and plan for its coming war. When the majority of the group went into hiding "in the hole" for months, Morton continued to fortify the compound; he moved the tires that had been behind the shooting range so that they surrounded the trailer, tunnel entrance, and channelized entries, thus further concealing the compound occupants while making the compound even more treacherous and deadly for any officers who may arrive.

While the compound was being further militarized, the Defendants continued to conceal Abdul Ghani's death and whereabouts and looked forward to the group's societal reckoning. *See, e.g.*, Gov. Trial Exs. 11, 93, 94.   The Court will recall that after Abdul Ghani died, Jany convinced the rest of the group that he was going to resurrect on Easter, which was April 1, 2018, and that he would lead the group to face society and kill those who did not join them.   In response, Siraj's firearms and tactical training—training that Morton fully participated in— ramped up in frequency, intensity, and complexity in anticipation of the Easter resurrection.

*See* Gov. Tr. Exs. 81, 82.   Finally, after Abdul Ghani did not resurrect on Easter, Jany began to talk about him returning around the time of his birthday or, chillingly, as the soon-to-be born child of Morton and Subhanah.   *See* Gov. Trial Ex. 85 at 21; Tr. at 536–37.

The harsh living conditions at the compound also speak volumes about the seriousness of the offenses.   This includes the dangerous and unsanitary conditions to which the group subjected their 12 children (11 after Abdul Ghani's death) for approximately nine months, approximately four months of which most of the children spent entirely underground in the tarp-covered trailer that they referred to as "the hole."   *See, e.g.*, Trial Transcript ("Tr.") at 407–08.

Thankfully, Morton and the rest of the group were taken away from the compound by well-prepared law enforcement and arrested before their plans could be realized, but Morton was a willing and important participant until the very end, when they were arrested.   He deserves a life sentence for the role he played.

2.   <u>History and Characteristics of the Defendant</u>

Morton, who is 46 years old, had one prior conviction for possession of a forged instrument and one prior arrest for criminal possession of marijuana before his arrest in August 2018.   Doc. 1100 at ¶¶ 60, 64.   There is limited information in the PSR about his educational and employment history, with him only providing that he graduated from high school in 1996 and worked in construction through 2017.   Id. at ¶¶ 76-77.   Many of Morton's family members live in New York, and they are raising and have adopted the five children he had with Subhanah.   The author of the PSR did not identify any factors that warrant a variance or departure from the guideline imprisonment range, *see id*. at ¶ 97, and the United States agrees.   Despite his limited criminal

history, there is simply no excuse for the crimes he committed, crimes that undoubtedly affected his own children in a myriad of adverse ways.

> 3.   The Need for the Sentence Imposed to Promote Respect for the Law, Provide Just Punishment, Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant

It goes without saying that all of the crimes Morton was convicted of committing are precisely the type of crimes that warrants a sentence of life imprisonment.   This is particularly true when the facts of this particular case are considered.   Such a sentence will promote respect for the law, provide just punishment and adequate deterrence, and protect the public.

> 4.   The Need to Avoid Unwarranted Sentencing Disparities Between Defendants Who Have Committed Similar Crimes

Every defendant who comes before the Court has a unique life, characteristics, circumstances, and criminal history which help the Court mold a suitable sentence for the particular defendant.   In this case, a sentence of life imprisonment satisfies the sentencing goals and ensures against disparities among similarly situated defendants.   A lesser sentence would not only result in an unwarranted sentencing disparity, but would also constitute an illegal sentence.

### III. CONCLUSION

WHEREFORE, the United States respectfully requests that this Court impose a sentence of life imprisonment for Defendant Lucas Morton.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*/s/ Electronically filed*
KIMBERLY A. BRAWLEY and
TAVO HALL
Assistant United States Attorneys

P.O. Box 607
Albuquerque, NM   87103
(505) 346-7274

*/s/ Electronically filed*
GEORGE C. KRAEHE
JESSICA JOYCE
Trial Attorneys
Counterterrorism Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC   20530

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which will
send notification to defense counsel, and
separate copies have been mailed to
Defendants Siraj Wahhaj and Lucas
Morton.

*/S/ Electronically filed*
KIMBERLY A. BRAWLEY
Assistant United States Attorney